816 So.2d 742 (2002)
Shon EVANS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D99-1470.
District Court of Appeal of Florida, Fourth District.
May 8, 2002.
Patrick L. Coughlin of Coughlin & Donelian, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Meredith L. Balo, Assistant Attorney General, Fort Lauderdale, for appellee.
STEVENSON, J.
Shon Evans was tried by jury and convicted of robbery and car jacking. Due to double jeopardy concerns, Evans was then sentenced on the carjacking conviction alone to thirty years imprisonment as an habitual violent felony offender. On appeal, Evans contends that his sentence is improper because the trial judge impermissibly considered evidence that he had brandished a firearm during the incident even though the jury acquitted him of the armed robbery and armed carjacking charges. We affirm.[1]

*743 The facts

The pertinent evidence at trial is as follows. On the evening of January 9, 1998, Scott Enterline and some friends had gone to the Palm Beach Ale House in West Palm Beach. After Enterline left the Ale House, he stopped to use the automatic teller machine (ATM) at a nearby Great Western Bank. Enterline went to the drive-up ATM, inserted his card and withdrew forty dollars. As Enterline got the money, he saw a man walk from behind the machine with a gun. The man reached in, turned the car off, and tried to get the keys. While the first man was trying to get the keys out of the ignition, two other men got into Enterline's car, one in back and the other in the front passenger seat. One of these men placed a gun at Enterline's right temple, but Enterline was not sure whether it was the man in front or the man in back. Enterline testified at trial that he "believed" that the man in the front seat pointed the gun at him. The men instructed Enterline to get out of the car and to give them his wallet. Enterline testified that he thought that the man in back had asked for the wallet.
According to Enterline, there were four people standing around his car. When the men stated that they wanted more money, Enterline protested that he did not have anymore, and at that point, the men began arguing. Enterline took this opportunity to try to step away unnoticed, but was forced to return when one of the men grabbed him by the neck. The men then tried to force Enterline back into the car, but he steadfastly refused. Finally, one of the men stated that they should just let Enterline go because they didn't need him. This started another argument between the men, and this time, Enterline took advantage of the distraction to successfully get away. Enterline hid behind some bushes and watched as the men drove away in his car.
Co-defendant Richard Jackson also testified at trial. According to Jackson, Bubba Bedford, one of the other men there that night, had a gun and walked up to the driver's window and asked for money. Jackson stated that William (Billy) Upperman, another participant, also had a gun. Although Jackson testified that he did not know that Billy and Bubba had guns on them that night, he was impeached by his prior statement given to Detective Houston that, in fact, he had the gun in his pocket that night and that he handed it to Bubba as they were approaching the vehicle.
Detective Ghianda testified that he had taken a statement from Evans at the police station. According to Ghianda, Evans initially denied that he was present at the scene of the robbery and stated that he was with his girlfriend. Evans later admitted that he was involved. Ghianda said that in the non-tape recorded portion of the interview, Evans stated that, during the course of the incident, he entered the front passenger side of the vehicle and was handed a gun by Billy Upperman and that "he then put the gun towards him [Enterline]." Ghianda added that he spoke with Upperman and that he recovered the gun from Upperman's house.
Evans did not testify at trial. The jury found Evans guilty of the lesser included offenses of car jacking and robbery. The jury found Evans not guilty of the attempted kidnaping charge. The trial court sentenced Evans to thirty years imprisonment as an habitual violent felony offender.

Discussion
In his sole point on appeal, appellant challenges his sentence. As this court has recently recognized, "the general rule in Florida is that when a sentence is *744 within statutory limits, it is not subject to review by an appellate court." Howard v. State, 27 Fla. L. Weekly D670, D670 (Fla. 4th DCA Mar.20, 2002). An exception is made, however, where the defendant's constitutional rights are violated in the imposition of sentence. See id. And, since the Supreme Court's 1948 decision in Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), it has been the law that it is a violation of a defendant's due process rights for the court to rely upon conduct for which the defendant has actually been acquitted in imposing sentence. See also Cook v. State, 647 So.2d 1066 (Fla. 3d DCA 1994); Epprecht v. State, 488 So.2d 129, 131 (Fla. 3d DCA 1986).
Here, Evans argues that his due process rights were violated when, during the sentencing hearing, the trial judge considered his possession of a firearm even though he was acquitted of the firearm component of each of the offenses:
[W]hile, of course, the court recognizes that, that the jury's verdict is sacrosanct, the facts are, the uncontroverted facts are that the defendant, Mr. Evans, in this case, took a firearm and held it to the head of the victim, Mr. Enterline....
... [T]his is a continuing course of violent habitual conduct that involved firearms, that involved violence, that involved pain, and, and the like, to, to, to innocent victims, innocent people who are going, who are trying to go about their daily lives.... It's very sad that Mr. Evans is, is merely eighteen years old.
But the question before the court is, is whose lives are more important. Does this community have the right to, to perhaps go to the bank, to walk down the street, to, to live a normal life without fear that a violent predator is going to, whose figure physically and the like is bigger than them can beat them and hurt them and steal what little or great they may own? They may take a firearm and put it to the side of their head? No. This isn't just bad choices.
In reaching our decision to affirm this sentence, we have looked closely at the evidence and the issues at trial. At trial, Evans' counsel raised the defense of duress and argued that Evans went along with the others because he was afraid of them. As for Evans' possession of a gun, defense counsel acknowledged Evans' "confession" and told the jury:
[Evans] even says when he gets the gun, he's entering the car, he's about to sit in the passenger side, front seat, he's in the threshold of the door. And he gives it right back to William Upperman.... [H]e knew it was wrong and he went along because he was scared and afraid....
. . . .
[Evans] tells you he has it [the gun] in his hands for a quick moment and he gives it away. And then he tells the police why he gave it away. Because I didn't want anything to do with it.
At trial, Evans' strategy was to acknowledge his admitted participation, invoke the defense of duress, and otherwise attempt to minimize his involvement.
The evidence was indeed undisputed that, at some point during this encounter with Enterline, Evans had a gun. Contrary to the trial judge's statement, the evidence was not "uncontroverted" that Evans pointed the gun at Enterline, but this factual inference has some support in the record as well. On the other hand, carrying a firearm "in the course of" a robbery or a carjacking is a technical term as defined in the statutes. An act is deemed to be "in the course of committing" a robbery or carjacking where it *745 occurs in the actual "attempt to commit" those offenses or "in flight after the attempt or commission." §§ 812.13(3)(a), 812.133(3)(a), Fla. Stat. (1997). The jury may have determined that the State did not prove beyond a reasonable doubt that Evans (or his accomplices, if the principal theory had been applied) carried the firearm in the actual "course of committing" the robbery and the carjacking. In view of the undisputed testimony and statements from those present that night that at least two of the assailants had guns, this may be the only rational interpretation of the jury verdict.
Therefore, Evans' acquittal on the armed robbery and armed carjacking charges cannot be seen as the jury's declaration that he never held or brandished a gun at any time during the entire incident. In the instant case, we find that Evans was not sentenced on the basis of acquitted conduct.[2]Compare Howard v. State, 27 Fla. L. Weekly D670, ___ So.2d ___, 2002 WL 429180 (Fla. 4th DCA Mar.20, 2002)(holding that in sentencing defendant for possession of cocaine, trial court was permitted to consider that defendant had a "substantial" and "more than street level" amount of narcotics even though defendant had been acquitted on charge of trafficking in more than 200 grams of cocaine); Reaves v. State, 655 So.2d 1189 (Fla. 3d DCA 1995)(stating that in sentencing defendant for trafficking in cocaine, trial court was permitted to consider that defendant kept a dangerous firearm in close proximity to his drug cache even though the defendant had been acquitted of armed trafficking).
Accordingly, the judgment and sentence on review is AFFIRMED.
POLEN, C.J., and KLEIN, J., concur.
NOTES
[1] The issue on appeal comes to the court via the trial court's denial of Evans' rule 3.800(b)(2) motion to correct sentencing error which was filed while the appeal was pending. See In re Amendments to Fla. Rules of Criminal Procedure 3.111(e) & 3.800 & Fla. Rules of Appellate Procedure 9.020(h), 9.140, & 9.600, 761 So.2d 1015 (Fla.1999), rh'g granted (Jan. 13, 2000).
[2] We note that the firearm component of the charges for which Evans was tried would have elevated those charges to first degree felonies. See §§ 812.13(2)(c) & 812.133(2)(b), Fla. Stat. (1997). Although Evans was ultimately sentenced as an habitual violent felony offender, the charges on which he was convicted remained second degree felonies, i.e., the potential penalty was at all times limited by law to that which could be imposed for a robbery and a carjacking where no firearm was "carried."